UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RENEE SZATKOWSKI,

                    Plaintiff,                    DECISION AND ORDER
                                                  04-CV-6001 CJS
vs.

MAXWELL'S BAR AND GRILL/RID
ENTERPRISES and MARC DROUIN, individually,

                    Defendants.

_____

**APPEARANCES**

For the plaintiff:            Karen Sanders, Esq.
                              730 First Federal Plaza
                              28 E. Main Street
                              Rochester, NY 14614

For the defendants:           No appearance

**INTRODUCTION**

By complaint filed with this Court on January 5, 2004, plaintiff commenced an action

against defendants,  Maxwell's Bar and Grill/RID Enterprises, and Marc Drouin, individually,

pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et. seq.*, as

amended, and the New York States Human Rights Law, Executive Law § 290, *et. seq.*

alleging in four causes of action that she was intentionally discriminated against based

upon her gender. Neither defendant appeared and on March 11, 2004, the Clerk of the

Court entered a default against both. By notice of motion filed on December 1, 2004,

plaintiff sought the following relief: correction of the caption of the summons and complaint, to read Marc Drouin instead of Mark Drouin; entry of a default judgment against defendants, pursuant to Federal Rule of Civil Procedure 55(b) (2), and a hearing to determine the proper amount of damages to which she is entitled.

## DISCUSSION

### Correction of Caption

The Court grants the application and the caption of the summons and complaint is amended to read Marc Drouin instead of Mark Drouin.

### Default Judgment and Inquest on Damages

On February 14, 2005, an inquest was held to allow the Court to determine the amount of damages to which plaintiff was entitled upon entry of a default judgment. One witness, plaintiff, Renee Szatkowski, testified at the inquest.

### 1. Standards of Law

### a.      Federal Rule of Civil Procedure 55(b)(2)

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, in order to determine the amount of damages in the context of a default judgment, the court may conduct  a hearing. It is, of course, well settled that a court, in lieu of a hearing, may rely on detailed affidavits and documentary evidence, along with its own personal knowledge of the record. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*,  109 F.3d 105, 111 (2d Cir.1997). Whether or not an evidentiary hearing is held, a court may not merely accept a plaintiff's statement as to damages. Rather, a court

must take the necessary steps to establish damages with reasonable certainty. *Id.* That is, while a defaulting party's liability is deemed established and such party loses his defenses against a claim, plaintiff is nonetheless required to introduce evidence to prove the extent of his or her damages. *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995). Of course, Rule 54(c) of the Federal Rules of Civil Procedure provides that a "judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." In other words, it

> would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give a different type of relief or a larger damage award.

*Pacific Westeel, Inc. v. D & R Installation*, No. 01 Civ. 0293 (RLC) (AJP), 2003 WL 22359512, *2, 2003 U.S. Dist. LEXIS 18436, *6-7, (S.D.N.Y. Oct. 17, 2003)

## 2.    Findings of Fact

At the outset, the Court notes that each of plaintiff's four causes of action seeks the following: that plaintiff be awarded general and compensatory damages, including pre-judgment interest, in an amount according to proof at trial;  that plaintiff be awarded punitive damages in an amount according to proof at trial; and that plaintiff be awarded reasonable attorney's fees and costs of the suit.

 Plaintiff Renee Szatkowski ("Szatkowski")  commenced employment with the defendant Maxwell's Bar and Grill/RID Entertainment ("Maxwell's") in approximately the last week in October of 2002.  The owner of Maxwell's was defendant Marc Drouin ("Drouin"). Plaintiff was initially hired by Drouin as a bartender.  Subsequently, near the end of December 2002 to beginning of January 2003, Drouin promoted plaintiff to bartending

manager. As bartending manager, her duties included hiring and firing, training bartenders and bar backs, and scheduling.   Eventually, she was also assigned to do accounts receivable and payable.   After her promotion, plaintiff was spending about thirty hours a week bartending and about twenty hours a week on office work.

At the end of November 2002, Drouin began asking her to go out with him. More specifically, he  asked her to go with him to Syracuse for the day to do some shopping, have dinner, and then take in some places around the town. Plaintiff politely said no, but Drouin did not take no for an answer and  persisted in asking her out. During that last week in November, Drouin asked plaintiff out about ten to twelve times more. Plaintiff responded by reminding Drouin that he had a wife and child and by telling him that she had a boyfriend.

After plaintiff was promoted, Drouin began flirting with her and saying they would make a really good pair. Additionally, Drouin who was frequently intoxicated at work, would bang his fists on the bar and tell plaintiff that she had to dance with him or she would be fired. When she was doing office work, he would come into the office and physically push himself up against her in a sexual way. Through the end of December, he did this about eight to fifteen times. Plaintiff reacted by pushing him away and leaving the office.

Then throughout the next month or two, Drouin started showing up at plaintiff's home, where she lived with her children. The first time he showed up, he asked plaintiff why she did not want to be with him. Plaintiff offered that it was because of his wife and her boyfriend. Thereafter, when  Drouin came to her house, plaintiff would not answer her door. However, Drouin, in an intoxicated condition, would telephone  plaintiff at her home. Plaintiff asked him to please stop, reminding him of how valuable he had said that she was.

On one occasion after Drouin began showing up at the house, plaintiff confronted him about it while at work, and he responded by banging his fist on the desk which frightened plaintiff to the point she left the office and went upstairs. Then Drouin, who continued to be intoxicated much of the time, demanded in front of all the customers that plaintiff dance with him.

Drouin's harassing conduct toward plaintiff continued up until the time he fired her during the last week of March or first week of April 2003. It caused her to cry every day and feel stressed and worthless. It also interfered with her ability to have sexual relations  with her boyfriend, as well as with her ability to sleep.  She sought the help of her OBGYN regarding the situation, and he prescribed an anti-depressant for her.

 From January to the end of March 2003, there were several incidents of physical contact that Drouin initiated with plaintiff. These occurred in the office at Maxwell's, and typically Drouin would push up against plaintiff and try to kiss her. On many of these occasions, Drouin touched plaintiff's private parts, including her breasts and buttocks,  and he even tried to put his hand down the back of her pants. Plaintiff responded to his attempts by pushing him away and going upstairs, as well as reminding him that he had a wife and child. In the two days before Drouin fired plaintiff he told her that she had everything in the palm of her hand, and he added that  if she didn't want to do it, she was easily replaced.

In fact, the very last night that plaintiff worked at Maxwell's, she and Drouin were in the kitchen,  and he pushed her up against the wall and put his tongue in her mouth. When plaintiff pushed him away, he broke the microwave by putting his fist through it, and plaintiff ran out of Maxwell's and went home. Afterward, Drouin called plaintiff asking if she would

be with him and telling her she could be the bar manager and run the place. Although Drouin had previously promised plaintiff the bar manager position, he fired her right after this incident.

At the time plaintiff worked at Maxwell's, the business employed between twenty-five and thirty people. Plaintiff does not recall that Maxwell's had any formal sexual harassment policy in place.  The only person to whom plaintiff complained was Andy Butler, the bar manager, whom  Drouin told her she would be replacing. She complained to Butler the week she was fired.

At the time she was fired, plaintiff was making $6.60 per hour at Maxwell's. However, this was exclusive of tips. According to plaintiff's final earning statement from Maxwell's that was provided to the Court, the last day she worked was April 12, 2003. Both this earning statement and her 2003 tax return, which was also provided, establish that her total earnings from Maxwell's in 2003, including tips,  was $ 6,410. After she was terminated from Maxwell's in March of 2003, plaintiff did not seek new employment until the summer of 2003, since due to what happened at Maxwell's she did not want to bartend anymore. In that regard, plaintiff did not feel good about herself, since she felt that the only reason that Drouin had promoted her and promised her the bar manager position  was because he wanted to have sex with her. When plaintiff did begin looking for work it was again as a bartender, and eventually, at the end of November 2003, she obtained employment at Keys Martini Bar, through a friend who owned the business. However, prior to obtaining that position, she applied at three or four places. At two of those places, Millennium and Six Pockets, she received terrible recommendations from Drouin and did not get either position. In fact at Six Pockets, plaintiff was asked when she could start, but

after a call to Drouin, in which it was related to her he gave her a terrible recommendation, she was informed that she would not be hired. During the time she was unemployed, plaintiff, who has four children, lost her home, found it hard to pay her bills, and applied for and received food stamps. Upon being hired at Keys Martini Bar in November of 2003, her responsibilities included  bartending, marketing, and singing. For marketing alone, which she did during the day, she received $6.50 an hour, and for tending bar she received $3.30 per hour.

Drouin, who was  personally  served, has  never responded to the lawsuit.

Defendants, having defaulted on plaintiff's claims that she was intentionally discriminated against based upon her gender, the Court now turns to its conclusions of law as to damages, which it bases upon its findings of fact as set forth above. At the outset, the Court notes that in her complaint plaintiff alleges:

> Upon information and belief, Defendant Maxwell's Bar & Grill/RID Enterprises is a corporation licensed to do business in the State of New York and is an employer for the purposes of application of Title VII of the Civil Rights Act of 1964, as amended and the New York State Human Rights Law, Executive Sections 290, *et. seq*.

(Complaint ¶ 7.)  Plaintiff further  alleges:

> Upon information and belief, Defendant Mark Drouin was the direct supervisor of the Plaintiff with the ability to hire and fire, and was the owner of Maxwell's Bar & Grill/RID Enterprises at the time of the discriminatory acts alleged herein occurred.

(Complaint  ¶ 8.)  Accordingly, on her Title VII claims, the Court determines that plaintiff can recover compensatory and punitive damages only against  Maxwell's and not against Drouin. *Mandell v. County of Suffolk,*  316 F.3d 368, 377 (2d Cir. 2003) ("the district court's dismissal of plaintiff's Title VII claims against Gallagher in his personal capacity must be

affirmed because under Title VII individual supervisors are not subject to liability.")[1]  On the issue of compensatory damages, this determination is of no consequence, since clearly both Maxwell's and Drouin are liable to plaintiff for compensatory damages on her New York Human Rights Law claims. *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542 (1984) (Under the Human Rights Law, "[a] corporate employee, though he has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination . . . if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others.") However, the Human Rights law does not allow for the recovery of punitive damages.  *Thoreson v. Penthouse Intern., Ltd.,* 80 N.Y.2d 490, 499 (1992).  Therefore, punitive damages are available to plaintiff only on her Title VII claims and only against Maxwell's. ("We thus conclude that permitting an aggrieved person to recover punitive damages in a court action would be incompatible with the nature of the remedial relief which the Legislature has consistently deemed appropriate for violations of the Human Rights Law." *Thoreseon v. Penthouse Intern., Ltd.*, 80 N.Y.2d 490, 499 (1992))        As to damages, the Court finds that the plaintiff is entitled to compensatory damages against Maxwell's and Drouin for loss of earnings.  In 2003, plaintiff worked at Maxwell's for approximately 15 weeks (January 1, 2003 through April 12, 2003) and earned $6,410. This averages out to $427.33 per week. After her discharge from Maxwell's, plaintiff was unable to obtain employment, through no fault of her own, for approximately 30 weeks until the end of November 2003. Therefore,

---

[1]"Being an owner, principal shareholder and/or general partner of a defendant corporation that engages in discriminatory actions does not cause an individual to be liable under Title VII." *Leykis v. NYP Holdings, Inc*., 899 F. Supp. 986, 990 (E.D.N.Y. 1995); *E.E.O.C. v. Johnson & Higgins*, Inc.  91 F.3d 1529, 1538 (2d Cir.1996).

plaintiff is entitled to recovery in the amount of $12,819.90 ($427.33 X 230 weeks) plus pre-judgment interest.

Additionally, the Court, in consideration of its factual findings, awards plaintiff the sum of $25,000 in compensatory damages against Maxwell's and Drouin for the emotional distress she sustained, which was proximately caused by Drouin's harassing conduct.

Finally, the Court finds that plaintiff is entitled to punitive damages against Maxwell's, pursuant to Title VII, in the amount of $25,000. In that regard, Drouin, plaintiff's direct supervisor and owner of Maxwell's, unquestionably acted with reckless indifference to plaintiff's federally protected rights. Moreover, there is no evidence that Maxwell's attempted to comply with the federal law by adopting and implementing policies and procedures designed to prohibit gender discrimination in the workplace.

## CONCLUSION

Accordingly, Maxwell's and Drouin are jointly and severally liable to plaintiff for compensatory damages as follows: $12,819.90 plus pre-judgment interest for loss of earnings; and $25,000 for emotional distress. Further, Maxwell's is liable to plaintiff in the amount of $25,000 for punitive damages. Plaintiff has two weeks from the entry of this decision and order to submit an application for attorney fees in accordance with Title VII. IT IS SO ORDERED.

Dated: Rochester, New York
    May 19, 2006

                        ENTER.


                        /s/ Charles J. Siragusa
                        CHARLES J. SIRAGUSA
                        United States District Judge